JUDGE SCHEINDLIN

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH D. PETERSON,<br>Personal Representative of the Estate<br>Of James C. Knipple (Dec.) (see Exhibit A<br>for a Full List of Plaintiffs),<br><br>                    Plaintiffs,<br><br>          v.<br><br>STANDARD CHARTERED BANK,<br><br>                    Defendant. | Case No.: _____<br><br><br><br>**COMPLAINT**<br><br><br><br>**Plaintiffs demand a trial by jury.** |

The Plaintiffs/Judgment Creditors listed on the attached Exhibit A ("Plaintiffs"), by their attorneys, allege the following based upon information and belief, except those allegations concerning Plaintiffs, which they allege based upon their personal knowledge.

## NATURE OF THE CLAIM

1.     Plaintiffs are the victims of the deadly Iran-sponsored 1983 terrorist bombing of the U.S. Marine Barracks in Beirut, Lebanon.  Plaintiffs include the representatives of the estates of the 241 American servicemen killed in that attack, many survivors of the bombing, and the family members, heirs and representatives of the killed and injured servicemen.

2.     In 2007, Plaintiffs obtained a judgment for $2,656,944,877.00 in compensatory damages (the "Judgment") against the Islamic Republic of Iran ("Iran") and Iran's Ministry of Information and Security ("MOIS" and, collectively with Iran, the "Judgment Debtors") for Iran's sponsorship of murderous acts of terrorism against Plaintiffs.

3.     By means of this action, Plaintiffs seek compensation for the wrongful conduct of Defendant Standard Chartered Bank ("SCB") and its New York branch ("SCB-NY").  SCB tortiously interfered with the enforcement of Plaintiffs' Judgment by conspiring with Iran and its agents to hide Iran's assets from its judgment creditors.  Those unlawful actions are part and parcel of Iran's longstanding, determined efforts to evade collection of the Judgment, and other judgments obtained by the victims of Iran's ongoing terror campaign.

4.     As the New York State Department of Financial Services ("NYSDFS") recently charged, for almost ten years, SCB "programmatically engaged in deceptive and fraudulent misconduct" in order to move at least $250 billion in wire transferred funds through SCB-NY on behalf of Iranian financial institution clients that were subject to U.S. economic sanctions (the "Iranian Transactions").  SCB also engaged in extensive efforts to conceal its conspiracy from regulators and Iran's judgment creditors.  The institutions for which SCB unlawfully conducted transactions in the U.S. included the Central Bank of Iran/Markazi ("Bank Markazi"), Bank Saderat and Bank Melli, all of which are Iranian state-owned institutions.

5.     SCB assisted Iran in concealing its interest in the Iranian Transactions by agreeing to "strip" information concerning the originators and beneficiaries of over 60,000 wire transfer transactions from the electronic system that banks utilize to conduct wire transfers.  By stripping that information from the wire transfer database, SCB endeavored to conceal from regulators, criminal authorities and Iran's judgment creditors the participation of Iran and its agencies and instrumentalities in transfers that were barred by 31 C.F.R. 560.516 and various New York banking laws and regulations.

6.     By concealing the interest of Iran and its agencies and instrumentalities in the Iranian Transactions, SCB enabled Iran to conduct dollar-based transactions barred by U.S. and

New York law and facilitated Iran's ongoing efforts to produce weapons of mass destruction ("WMDs"), to promote nuclear proliferation and to engage in acts of international terrorism.

7.     SCB's unlawful conduct also enabled Iran to escape the "blocking" of its assets mandated by federal law when those assets come into the possession of banks operating in the U.S. Had SCB acted lawfully and blocked the Iranian funds federal law required SCB to block, Plaintiffs would have attached and executed upon those assets.

8.     Thus, SCB's conspiratorial misconduct and deliberate efforts to advance Iran's interests at the expense of that terrorist state's judgment creditors directly and proximately caused Plaintiffs to suffer substantial damages, *i.e.*, SCB's conduct prevented Plaintiffs from attaching and executing upon the Iranian assets that SCB was required by law to block and thereby make available for Plaintiffs to collect.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action under and pursuant to 28 U.S.C. §1332(a) because this is an action for damages in excess of $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiffs and Defendant SCB.

10.     This Court has personal jurisdiction over Defendant SCB because of its substantial and continuous activity in the United States and in this District through SCN-NY and because SCB directed the conduct described herein to this District and intended that such conduct would have substantial effects here.

11.     The Iranian Transactions that SCB completed, SCB's stripping of information concerning the identities of the originators and beneficiaries of those transactions from the wire transfer database that recorded the transactions, and the willful failure to block funds transfers in

3

accordance with applicable U.S. law were conducted in the U.S. and had direct effects in the U.S. SCB and SCB-NY played an indispensable role in completing all 60,000 of the illicit wire transfers, none of which could have been undertaken without SCB's participation.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (d).

## PARTIES AND JUDGMENT DEBTORS

13.    Plaintiffs are the victims of the deadly Iran-sponsored 1983 terrorist bombing of the U.S. Marine barracks in Beirut, Lebanon. Plaintiffs include the representatives of the estates of the 241 United States servicemen killed in that attack, many survivors of the bombing, and the family members, heirs and representatives of the killed and injured servicemen. All Plaintiffs are United States citizens residing in various states in the United States, including the State of New York.

14.    Defendant SCB is a company formed under the laws of, and headquartered in, the United Kingdom (Great Britain). SCB is a wholly owned subsidiary of Standard Chartered plc, a British public limited company, which is a leading international banking institution headquartered in London, England. Through various subsidiaries, Standard Chartered plc operates over 1,700 offices in 70 markets globally.

15.    SCB offers a wide range of banking products and services to its personal, business and wholesale banking clients worldwide, including through its branch office (SCB-NY) in this District. The clients of SCB include some of the largest corporations and financial institutions in the world.

16.    In 1976, SCB-NY was licensed by the then-New York State Banking Department to operate as a foreign bank branch. SCB-NY primarily conducts a U.S. dollar clearing business. SCB-NY clears approximately $190 billion per day for its international clients. It also engages

4

in corporate lending, project and structured finance, trade finance, cash management, foreign exchange trading, and wire transfer services.

## THE FACTS AND CIRCUMSTANCES THAT DEMONSTRATE PLAINTIFFS' ENTITLEMENT TO RELIEF

**A.    Plaintiffs' Judgment against Iran for Its Support of Murderous Terrorist Acts**

17.    Plaintiffs hold the unsatisfied Judgment in the total amount of $2,656,944,877.00 against the Judgment Debtors, Iran and MOIS.

18.    The United States District Court for the District of Columbia entered the Judgment on September 7, 2007.  A copy of the Judgment is annexed hereto as Exhibit B.  On March 24, 2008, Plaintiffs registered the Judgment in the United States District Court for the Southern District of New York  pursuant to 28 U.S.C. § 1963 under Docket No. Misc. 18-302.

19.    As the United States District Court for the District of Columbia found before issuing the Judgment, MOIS, acting as Iran's agent, committed the Marine Barracks attack within the scope of that agency.  A MOIS operative carried out the attack with the assistance of the Iranian-funded Hezbollah terrorist group by detonating powerful explosives at the Marine Barracks.

20.    Plaintiffs' Judgment was based upon claims brought under 28 U.S.C. Section 1605(a)(7) of the Foreign Sovereign Immunities Act ("FSIA").

21.    Plaintiffs' Judgment was widely publicized and could not have escaped SCB's attention.

22.    SCB also recognized throughout the course of its participation in its conspiracy with Iran that Iran has long sought to protect its assets against efforts by victims of terrorism and others to collect upon substantial judgments secured against Iran and its agencies and instrumentalities.

5

23.   Iran has sought to achieve that objective by hiding its participation in a wide variety of financial transactions in the U.S. because the transactions of Iran and its agencies and instrumentalities have long been subject to sanctions imposed by the U.S. government, including the "blocking" of the funds involved in those transactions.  When Iranian assets are blocked pursuant to the U.S. regulatory scheme, those assets are no longer available for use by Iran and its agencies and instrumentalities, and the blocked assets are accessible by Iran's judgment creditors, including Plaintiffs, pursuant to traditional collection procedures as well as by virtue of federal and state laws specifically directed at facilitating the collection of judgments by the victims of terrorism.

24.   Notably, Iran has publicly stated through its state-owned news agency that it rejects the legitimacy of Plaintiffs' Judgment.  Iran also continues to deny responsibility for Plaintiffs' losses.  Thus, Iran and its various agencies and instrumentalities knew that Plaintiffs and other judgment creditors held large judgments against Iran that they might seek to satisfy against any Iranian assets that passed through the United States.

25.   Thus, SCB, Iran and Iran's agencies and instrumentalities all recognized that one of the goals of their conspiracy was to conceal Iran's role in the Iranian Transactions in order to thwart the collection of Plaintiffs' Judgment and the judgments of the many other victims of Iran's terrorist acts.

6

**B.      Plaintiffs' Diligence in Seeking to Collect on Their Judgment**

26.    Plaintiffs served a subpoena on the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") on or about March 10, 2008 information regarding any Iranian assets in the United States.

27.    In response to that subpoena, Plaintiffs received a June 11, 2008 letter from OFAC. That letter provided information to Plaintiffs regarding assets held by an Iranian governmental entity maintained in the U.S. at a financial institution other than SCB.

28.    Notably, because of SCB's unlawful conduct, Plaintiffs never received any information from OFAC, or any other government agency, that SCB at any time held any substantial assets belonging to Iran or any of its agencies or instrumentalities.

29.    On June 12, 2008, Plaintiffs used the information obtained the previous day from OFAC to secure the issuance of an Execution by the Clerk of the U.S. District Court for the Southern District of New York (the "Initial Execution").  Immediately thereafter, Plaintiffs filed the Initial Execution with the Office of the United States Marshals Service in this District for execution on the goods and chattels of Iran.

30.    That Initial Execution specifically identified the assets that OFAC listed in its June 11, 2008 letter.  The United States Marshals' Service served the Initial Execution on the relevant party on June 13, 2008.

31.    On June 16, 17, 23 and 24, 2008, Plaintiffs served restraining notices and amended restraining notices issued pursuant to CPLR § 5222 on the parties in possession of the Iranian assets listed in OFAC's June 11, 2008 letter.

32.    On June 25, 2008, the United States District Court for the District of Columbia issued an order pursuant to 28 U.S.C. § 1610(c), nunc pro tunc from March 10, 2008, that permitted execution to proceed upon the Judgment.

33.    By virtue of those executions and restraints, Plaintiffs have to date successfully restrained in New York substantial assets belonging to Bank Markazi, an Iranian agency and instrumentality.  Those assets were blocked by President Obama's February 5, 2012 Executive Order 13599 ("E.O. 13599").

34.    E.O. 13599 recognizes and responds to the critical role that Bank Markazi plays in Iran's ongoing efforts to conceal and facilitate its evasion of international sanctions and other illegal conduct.  The Executive Order notes the "deceptive practices of [Bank Markazi] and other Iranian banks to conceal transactions of sanctioned parties, the deficiencies in Iran's anti-money laundering regime and the weaknesses in its implementation, and the continuing and unacceptable risk posed to the international financial system by Iran's activities."

35.    Bank Melli and Bank Sadarat have long performed a similar role in concealing and facilitating Iran's evasion of international sanctions imposed as a result of Iran's financing of international terrorism and efforts to promote the proliferation of WMDs.

36.    The assets blocked pursuant to E.O. 13599 are subject to attachment and execution by Plaintiffs under the Terrorism Risk Insurance Act of 2002 ("TRIA"), which provides a mechanism for the enforcement of judgments against designated state sponsors of terrorism, such as Iran, and those sovereigns' agencies and instrumentalities.

37.    Plaintiffs are currently pursuing claims arising under TRIA, other provisions of the FSIA and the common law against Iran, Bank Markazi and certain of their chosen financial institutions in the U.S. District Court for the Southern District of New York.

C.    **Iranian Sanctions and U-Turn Transactions**

38.    Through OFAC, the U.S. government administers and enforces a sanctions regime against those who attempt to use the U.S. financial system in contravention of U.S. foreign policy and those foreign countries, entities, and individuals who may present a threat to national security.  OFAC imposes these sanctions in an effort to prevent U.S. dollars from being used to finance terrorist organizations, proliferators of WMDs, drug traffickers and other hostile enterprises.  Foreign governments currently subject to OFAC sanctions include Iran, North Korea and the Sudan.

39.    Financial transactions with Iran have been subject to U.S. economic sanctions since 1979.  These measures were strengthened by Executive Orders issued in 1995 that set strict requirements for U.S. banks to follow in clearing U.S. dollar transactions involving Iran.  The International Emergency Economic Powers Act, 50 U.S.C. § 1705, makes it a crime willfully to evade, or attempt to evade, OFAC sanctions.

40.    Until November 2008, OFAC rules had permitted, under limited circumstances and with close regulatory supervision, U.S. financial institutions to process certain transactions for Iranian banks, individuals, and other entities.  Pursuant to federal regulations, those transactions were permissible in some circumstances provided that they were initiated offshore by non-Iranian foreign banks and only passed through the U.S. financial system on the way to other non-Iranian foreign banks.  Those transactions are commonly referred to as "U-Turns" or "U-Turn Transactions."

41.    OFAC imposed exceedingly stringent standards on banks involved in U.S. dollar clearing U-Turns, including the U.S.-based operations of foreign banks.  For example, OFAC regulations required that "*[b]efore* a United States depository institution initiates a payment on

behalf of any customer, or credits a transfer to the account of the ultimate beneficiary, *the United States depository institution must determine that the underlying transaction is not prohibited by this part.*" 31 CFR § 560.516 (c) (emphasis added).

42.    The obligation to determine that a U-Turn complied with U.S. law thus fell squarely on banks operating in the U.S., including branches of foreign banks such as SCB-NY.  To satisfy that obligation, U.S. clearing banks relied heavily on the accuracy and completeness of wire transfer messages they received from correspondent banks and overseas branches.  When banks properly provided information concerning the participants in U-Turns, that information became available to law enforcement agencies to use in tracking suspicious conduct.

43.    In instances where Iranian-related wire transfer instructions did not provide sufficient information to determine that a U-Turn was permissible under federal law, OFAC required that the assets be frozen until the U.S. bank involved in processing the transaction received the relevant information or the U.S. bank rejected the transaction.

44.    By 2008, it was clear that this system of wire transfer checks had been abused and that U.S. foreign policy and national security could be compromised by permitting U-Turns to continue.

45.    As a result, the U.S. Treasury Department revoked authorization for U-Turn Transactions in November 2008 because it suspected Iran of using Iranian banks – including Bank Markazi, Bank Saderat and Bank Melli – to finance nuclear weapons and missile programs. The U.S. also suspected that Iran was using its banks to finance terrorist groups, including Hezbollah, Hamas and the Palestinian Islamic Jihad, and that Iran was engaging in deceptive conduct to hide its involvement in various other prohibited transactions, such as assisting OFAC-sanctioned weapons dealers.

46.    Since October 25, 2007, SCB-NY was required to block and report to OFAC any transfers of assets involving Bank Saderat or Bank Melli. *See* OFAC FAQ (available at http://www.treasury.gov/resource-center/faqs/sanctions/pages/answer.aspx).

**D.    SCB's Wrongful Conduct in Thwarting the Enforcement of Plaintiffs' Judgment**

47.    On August 6, 2012, the NYSDFS, which is charged with regulating banks in the State of New York, issued an order to show cause (the "NY Order") threatening to revoke SCB-NY's license to engage in banking activity in this State as a result of SCB's participation in its scheme to hide Iran's involvement in the Iranian Transactions.  As the NYSDFS alleged, SCB and SCB-NY conducted the Iranian Transactions in knowing violation of U.S. law and in furtherance of a conspiracy with Iran and its agencies and instrumentalities to evade U.S. sanctions.

48.    The NYSDFS has specifically charged SCB with operating "as a rogue institution" and noted that the highest levels of SCB's management expressed concern that the bank might be criminally liable for its unlawful practice of concealing transactions involving Iranian entities from U.S regulators.

49.    Nevertheless, SCB demonstrated absolute contempt for U.S. law and banking regulations.

50.    For example, SCB's CEO for the Americas expressed grave concerns regarding the "catastrophic reputational damages" and/or "serious criminal liability" that might result from SBC's unlawful concealment of the Iranian Transactions from U.S. regulators.  Amazingly, SCB's Group Executive Director in England caustically responded to those concerns by stating, "You f---ing Americans.  Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."

51.     According to the NY Order, SCB concealed from New York and U.S. regulators roughly 60,000 U-Turns that SCB undertook for Iranian clients during a nine-year period from early 2001 through 2010.  These U.S. dollar transactions originated and terminated in European banks in the United Kingdom and the Middle East and were cleared through SCB-NY.

52.     SCB possessed an obvious motive for engaging in the illicit Iranian Transactions.  Those transactions totaled at least $250 billion in the aggregate, and generated *hundreds of millions of dollars in fees for SCB.*

53.     SCB's success in building a massive business clearing U.S. dollar transactions on behalf of Iranian financial institutions was a result of concerted efforts to evade U.S. sanctions against Iran.

54.     As early as 1995, soon after President Clinton issued two Executive Orders announcing U.S. economic sanctions against Iran, SCB's General Counsel embraced a framework for regulatory evasion.  He advised SCB's regulatory compliance staff that, "if SCB London were to ignore OFACs regulations AND SCB NY were not involved in any way & (2) had no knowledge of SCB Londons [sic] activities & (3) could not be said to be in a position to control SCB London, then IF OFAC discovered SCB Londons [sic] breach, there is nothing they could do against SCB London, or more importantly against SCBNY."

55.     Recognizing the criminal implications of that advice, SCB's General Counsel instructed that the memorandum containing this plan was "highly confidential & MUST NOT be sent to the US."[1]  (Emphasis in original).  SCB's General Counsel added that "when dealing with

---

[1] The NYSDFS cites the source of this information as a June 1, 1995 email from SCB's General Counsel to SCB's Group Compliance Manager.  SCB-00038523 (emphasis in original).  [The Bates stamp identifiers that appear in this Complaint relate to documents provided to the NYSDFS and cited in the NY Order.]

OFAC countries that are not on the UK's list [of banned entities,] SCB London should use another US Dollar clearer in NY.  It should not in any event use SCB NY."

56.    Indeed, in fairly mercenary terms, the General Counsel recommended that "SCB should use eg [National Westminster Bank,] who in processing the transactions would breach OFAC regulations & would expose [itself] to a penalty."

57.    That advice further evidences the knowledge of SCB and its General Counsel that clearing the Iranian Transactions amounted to a violation of U.S. law.

58.    Nevertheless, SCB executives continued year-after-year to process the illicit Iranian Transactions in order to pad SCB's bottom line.

59.    Years after SCB commenced its practice of stripping identifying information from the Iranian Transactions, another senior SCB executive decided to continue engaging in this unlawful practice *after* conducting a cost-benefit analysis regarding the implications of U.S. government discovery of SCB's conduct.

60.    In that analysis, the SCB executive noted that "the current process under which some SWIFT messages are *manually 'repaired' to remove reference to Iran could (despite accepted SWIFT protocols) be perceived by OFAC as a measure to conceal the Iranian connection from SCB NY, and therefore evade their controls for filtering Iran-related payments.* Unless transactions are repaired they face delays caused by investigations in the U.S. banking system, subjecting SCB to interest claims."

61.    The executive described SCB's repair procedures as a "process to check that a payment is, prima facie, an acceptable U-turn transaction (i.e. offshore to offshore)," and fully

acknowledged that "they *do not provide assurance that it does not relate to a prohibited transaction, and therefore SCB NY is exposed to the risk of a breach of sanctions.*"[2]

62.   In early 2001, Bank Markazi, a state-owned, OFAC-sanctioned institution, approached SCB to request that it act as Bank Markazi's recipient bank for U.S. dollar proceeds from daily oil sales made by the National Iranian Oil Company.  SCB viewed this engagement as "very prestigious" because "in essence, SCB would be acting as Treasurer to the [central bank of Iran]. . . ."[3]

63.   The timing of the $500 million in daily U.S. dollar payments that Bank Markazi stated it would process through SCB was a critical component of the deal between SCB and Bank Markazi.  A senior manager of SCB's Iranian business noted that "the most important aspect to CBI/Markazi of this relationship with SCB" was SCB's "willingness to pay away funds in advance of receipts (intraday of up to USD 200m)."  He stressed that providing rapid U.S. dollar payments for Bank Markazi "could lead to increased business activity with [other Iranian] banks."[4]

64.   SCB's knowing participation in its conspiracy with Iran is also evidence by a March 23, 2001 email from SCB's Group Legal Advisor to its Product Manager, Corporate & Institutional Banking and its General Counsel that was forwarded to SCB's Group Head of Audit, its Head of Institutional Banking & Global Head of Business Segment, and its Head of

---

[2] The NY Order notes that the source of this information is a December 1, 2005 memorandum entitled *Project Gazelle* that was authored by SCB's Group Head of Compliance and Regulatory Risk and its CEO, United Arab Emirates, for SCB's Group Executive Director for Risk and its Group Head of Global Markets.  SCB INT 0017483.

[3] The NY Order identifies the source of this information as a February 19, 2001 email from SCB's Head of Inbound Sales, Institutional Banking, to SCB's Head of Group Market Risk, SCB's Group Head of Institutional Banking and Global Head of Business Segment, and SCB's Head of Funds Management.  SCB INT 0005352.

[4] *Id.*

Inbound Sales, Institutional Banking.  SCB INT 0005367-68.  In that email, SCB's Group Legal Advisor counseled several SCB officers that "our payment instructions [for Iranian Clients] should not identify the client or the purpose of the payment."

65.    In deciding to strip identifying information from the Iranian Transactions, SCB also bowed to pressure that it received from its Iranian clients.

66.    According to the NYSDFS, those Iranian clients warned SCB that disclosure of their identities to U.S. banks would cause unacceptable delays in clearing funds.  Indeed, an October 3, 2003 email from SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking to SCB's outside U.S. legal counsel, SCB-NY's Head of Legal & Compliance, Americas, SCB-NY's Head of Legal for Corporate & Institutional Banking and SCB's Product Manager, Corporate & Institutional Banking (SCB INT 0020023) demonstrates that SCB well understood that "given that these are large wholesale sums they [i.e., the Iranian clients] are worried by any delay."

67.    Furthermore, the NYSDFS's investigation revealed that SCB's Iranian clients were concerned "not only [with] what delays would be caused by [SCB-NY], but also what delays could be caused by any other U.S. institution through which the payment was routed."  As a result, SCB's Iranian clients insisted that SCB strip the identifying information from the U-Turn Transactions.  The Iranian clients sought to justify this illicit conduct by claiming that "no other banks processed their payments with full disclosure and it was not industry practice to do so."[5]

68.    SCB even continued to engage in the illicit Iranian transactions after it was advised by U.S. counsel that the procedures that SCB had implemented were inadequate.

---

[5] The NYSDFS identifies the source of this information as a note of an interview with SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking.  SCB INT 0001338-1340.

69.    At least as early as March 21, 2001, SCB obtained outside legal advice regarding its U-Turn policy that pointed out the impropriety of SCB's actions.

70.    In a May 15, 2001 Legal Memorandum from SCB's U.S. outside legal counsel entitled *OFAC Regulations Iranian Payments/Standard Chartered London/New York* that was directed to SCB's Group Legal Advisor and Head of Compliance, Americas, outside counsel referenced earlier guidance provided on March 21, 2001 and advised SCB that compliance with U.S. law required a process by which SCB-NY received "foreknowledge of such authorized [U-Turn] payments" so as to "otherwise ascertain that the payments are authorized."  SCB INT 0001131.  Counsel further advised SCB that SCB-NY needed to "assure itself that it is making permissible payments."

71.    Rather than institute any the procedures advised by outside counsel, SCB instead conspired with its Iranian clients to transmit misinformation to SCB-NY by removing and otherwise misrepresenting wire transfer data that could identify Iranian parties.  While SCB concealed relevant information from SCB-NY in this rudimentary manner, SCB-NY would have been well aware of SCB's conspiracy has SCB-NY engaged in reasonable efforts to determine the nature of the transactions that SCB conducted through SCB-NY.

72.    For example, SCB instructed Bank Markazi to "send in their [necessary wire transfer documentation][6] with [SCB London's business identifier code] *as this is what we*

---

[6] Two common SWIFT payment messages were used for U-Turn transactions: "MT-103" and "MT-202."  For any particular U.S. dollar clearing transaction, the MT-103 identified all parties involved in the transaction, as funds flowed from the initial remitter, through correspondent banks, to the ultimate beneficiary's bank account.  On the other hand, MT-202s are merely bank-to-bank credit transfers.  They therefore lacked the detailed transaction party information contained in MT-103s.

*required them to do in the initial set up of the account. Therefore, the payments going to NY do not appear to NY to have come from an Iranian Bank.*" (Emphasis added).[7]

73.    SCB also intentionally evaded the controls designed to avoid the processing of unlawful transactions involving Iranian clients by, among other steps: (a) inserting special characters (such as ".") in electronic message fields used to identify transacting parties; (b) inserting phrases such as "NO NAME GIVEN" or "NOT STATED" in lieu of identifying the bank's Iranian clients; and (c) employing SCB's "repair procedure," whereby SCB overseas employees screened payment messages – before they were communicated to SCB-NY – in order to ascertain if any messages contained information that identified Iranian clients.

74.    SCB understood that simply omitting Iranian client information on SWIFT MT-202 payment messages going to New York would not accomplish its objective of concealing the Iranian Transactions from U.S. regulators because the electronic payment system would automatically fill in blank data fields and thereby flag the transactions as involving Iranian clients.

75.    Accordingly, to disguise the transactions effectively and avoid regulatory scrutiny, SCB made false and misleading entries in SWIFT "field 52," a data field that would identify the Iranian party.

76.    SCB's in-house counsel were actively involved in concealing the bank's participation in the conspiracy to conceal Iran's involvement in the Iranian Transactions. For example, documents show that SCB's attorney in charge of Bank Secrecy Act/Anti-Money

---

[7] The NY Order identifies the source of this information as an October 15, 2003 email from SCB's Manager, Cash Management Services, London to SCB's Product Manager, Corporate & Institutional Banking, and its Head of Cash Management Services, UK.  SCB INT 0001471. That email was also forwarded to SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking, SCB's Head of Legal & Compliance, Americas and SCB's Head of Legal for Corporate & Institutional Banking (SCB INT 0001469).

Laundering ("BSA/AML") compliance described wire stripping as "the process for effecting Bank Markazi's payment instructions."

77.   In an interview with the NYSDFS, that attorney stated that he was specifically told that "field 52 (ordering institution) is quoted by Bank Markazi in their MT202 as [SCB London]" or SCB would manually "repair" or "over-type field 52 as [SCB London]." The in-house lawyer understood that these actions would leave "no reference to Bank Markazi" and would thereby "send[] incorrect information."[8]

78.   SCB's documents further reveal that the bank actually memorialized the procedures designed to hide Iran's involvement in the Iranian Transactions in formal operating manuals.

79.   One such manual, entitled "Quality Operating Procedure Iranian Bank Processing," directed SCB London employees to "repair payment[s] by making appropriate changes" to transacting party codes.  It provided step-by-step wire stripping instructions for any payment messages containing information that would identify Iranian clients.

80.   An example directive read: "[e]nsure that if the field 52 of the payment is blank or displays [sic] any SWIFT code that it is overtyped at the repair stage to a '.'  This will change the outgoing field 52 on the MT103 to a field 52D of '.'  Or, in the case of a 'normal' MT202 instruction change the field 52 on the outgoing MT202 to [SCB-NY] to a '.' (Note: if this is not done then the Iranian Bank SWIFT code may appear – depending on routing – on the payment message being sent to [SCB-NY])."  SCB INT 0005722.

81.   An instruction on that manual's cover stressed that "this procedure is a mandatory requirement" and that "[a]mendment is not permitted without prior approval of the Head of Cash Management Services UK Quality System."  *Id.* at SCB INT 0005719S.  In an October 1, 2005

---

[8] The NY Order identifies the source of that information as the notes of an interview with SCB's head of Legal and Compliance Wholesale Bank, UK/Europe.  SCB INT 0003674.

email, SCB's chief lawyer in charge of Legal & Compliance for its Wholesale Bank division commented to other senior legal and compliance staff that the Quality Operating Procedures manual, "read in isolation, is clearly . . . designed to hide, deliberately, the Iranian connection of payments."[9]

82.   The masking procedures that SCB employed with respect to the Iranian Transactions evolved over time to meet the growing volume demands of SCB's Iranian clients.

83.   Eventually, SCB concluded that its business with Iranian clients would grow too large for SCB employees to "repair" manually the instructions for New York bound wire transfers conducted for those clients.  As a result, SCB automated the process for "repairing" the wire transfers by building an electronic repair system with "specific repair queues," for each Iranian client that the bank serviced.[10]

84.   SCB engaged in those blatant efforts to evade regulatory scrutiny and serve the interests of its Iranian co-conspirators even as the bank's outside counsel continued to admonish SCB not to undertake efforts to evade regulatory requirements.

85.   For example, in October of 2003, one of SCB's outside legal counsel in the U.S. warned that the bank's system for executing U-Turns anonymously through SCB-NY did "not comport with the law or the spirit of OFAC rules, which lay out explicit details on how such

---

[9] The NY Order identifies the source of this information as an October 1, 2005 email from SCB's Group Head of Legal & Compliance, Wholesale Bank that forwarded the *Quality Operating Procedure* manual to SCB's Group Head of Compliance and Regulatory Risk, its Group Legal Advisor and its Head of Financial Crime Risk Systems and Monitoring.  SCB INT 0005715-5716.

[10] The NY Order cites the notes of an interview with SCB's Manager, Cash Management Services, London as the source of this information.  SCB INT 0001620-1621.

transactions are to be conducted." She further instructed that "OFAC insists on full disclosure of all parties in transactions to ensure that transactions meet the terms of the rule."[11]

86.    Prompted by this guidance, one SCBSCB executive observed that, "historically, [for Iranian U-Turns] we have not transparently declared the remitting/receiving entity details, and of course this past practice makes it harder for internal and external parties to accept our views now."[12] An SCB executive compliance attorney made the point more sharply, observing that SCB's London staff believed "that any payment that could conceivably give rise to an OFAC problem should always be dealt with [in a way to avoid detection]."[13]

87.    Beginning in 2003, other banks with significant Iran portfolios began exiting the U-Turn business. For instance, SCB's business managers learned that Lloyds TSB London was "withdrawing their services" with one of its Iranian client banks "primarily for reputational risk reasons."[14] Rather than follow suit, and despite the bank's significant and growing concerns regarding reputational risk and OFAC sanctions, SCB consistently endeavored to increase its stake in the market share for processing Iranian U-Turn Transactions.[15]

---

[11] The NY Order cites an October 6, 2003 email from SCB's U.S. outside counsel to SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking, and SCB-NY's Head of Legal & Compliance, Americas and Head of Legal for Corporate & Institutional Banking as the source of this information.  SCB INT 0020020.

[12] The NY Order cites an October 7, 2003 email from SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking to SCB's Head of Institutional Banking and Global Head of Business Segment and its Group Head of Compliance and Regulatory Risk as the source of this information.  SCB INT 0020019.

[13] The NY Order reports that the source of this information is a September 4, 2003 email from SCB's Legal Counsel and Head of Compliance, Wholesale Bank, UK/Europe, to SCB's Head of Legal, Wholesale Bank and SCB's Group Head of Legal & Compliance.  SCB INT 0005690.

[14] The NY Order reports that the source of this information is a March 9, 2003 email from SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking (via her assistant) to several of SCB's wholesale bank business managers.  SCB INT 0001419.

[15] The NY Order reports that the source of this information is a memorandum entitled, *Summary of the Risks/Issues to be Addressed with Regard to Iranian Bank USD Clearing that Require*

88.   SCB's concerted efforts to position itself as the market leader in conducting U-Turn Transactions on behalf of Iranian clients is described in a December 2005 internal memorandum written by SCB's CEO for the United Arab Emirates and the Group Head of Compliance and Regulatory Risk.

89.   That memorandum, which was entitled *Project Gazelle, Report on Iranian Business*, was circulated among SCB's key legal, compliance, and Iranian client business managers.  According to the memorandum, SCB's "short to medium term strategy [was] to grow the wholesale business by growing our wallet share from existing relationships with Financial Institutions and Iranian companies and establishing new relationships with Iranian companies and [intermediaries] in oil and gas related businesses."[16]

90.   Consistent with its historical actions, SCB decided that regulatory compliance would severely impede its ability to build the lucrative business with Iranian financial institutions.  As a result, SCB management decided to continue its wire stripping practices unabated.

91.   Summarizing the bank's linchpin consideration, SCB's chief legal and compliance officer for its wholesale banking business explained that SCB engaged in wire stripping because "there would be a delay in the OFAC que [sic] if an Iranian name was spotted by the OFAC filter in New York and the payment would get held up."  Any such delay, he concluded, would be "a

---

*Management Direction from Middle East Senior Management Team* that accompanied the March 9, 2003 email referenced in note 21.  That memorandum emphasized that that additional Iranian business may "trigger an action" from OFAC, thereby "leaving SCB exposed, with potential reputational damage."  SCB INT 0001420.

[16] The NY Order cites a memorandum dated December 1, 2005 that was entitled *Project Gazelle* as the source of this information.  That memorandum was drafted by SCB's Group Head of Compliance and Regulatory Risk and its CEO, United Arab Emirates for SCB's Group Executive Director for Risk and its Group Head of Global Markets.  SCB INT 0017481.

deal-breaker" in SCB's efforts to develop new business processing dollar-denominated transactions for Iranian clients.[17]

92.   To avoid such deal-breakers, SCB instituted a system of so-called "offshore OFAC due diligence."

93.   That entire concept was a sham. Any off-shore substitute for OFAC compliance would have necessarily caused the exact delay threatened by OFAC compliance at SCB-NY. Under the law governing at the time, any legitimate due diligence was premised on investigative delay. SCB undertook its off shore due diligence program, however, specifically to escape OFAC's watchful eye, not to facilitate transparency.

94.   SCB's overseas due diligence staff members were responsible for both SCB's U-Turn "repair procedures" and OFAC "compliance" – a paradoxical state of affairs to say the least.

95.   These staff members did not know the elements of a lawful U-Turn transaction other than that the payment "had to be offshore to offshore," and they were not trained to determine whether the underlying transactions were valid according to the federal Iranian Trade Regulations that governed the ability of banks to conduct financial transactions with Iranian institutions.[18] In fact, as late as August 2006, SCB's operations staff still "resolve[d] 'hits' on sanctioned names *directly with the customer*" – a method ill-designed to detect client misconduct. (Emphasis added). [19]

---

[17] The NY Order cites the notes of an interview with SCB's Head of Legal & Compliance, Wholesale Bank, U.K./Europe as the source of this information. SCB INT 0003675.

[18] The NY Order identifies the source of this evidence as a note of an interview with SCB's Manager, Cash Management Services, London. SCB INT 0001628 1629.

[19] The NY Order identifies the source of this evidence as an August 3, 2006 memorandum entitled *Sanctions Compliance Report*. SCB INT 0002051.

96.    SCB's "due diligence" staff engaged in these manipulations with the full support of SCB's senior management.  Indeed, senior SCB management knowingly and enthusiastically embraced the bank's fraudulent U-Turn procedures.

97.    The following actions, among others, evidence the knowing participation of SCB senior management in the bank's efforts to launder funds for Iranian clients and to evade detection of those transactions by U.S. regulators:

- In a 2005 report, senior SCB executives noted "the current process under which some SWIFT messages are manually 'repaired' to remove reference to Iran could . . . be perceived by OFAC as a measure to conceal the Iranian connections from SCB NY, and therefore evade their controls for filtering Iranian related payments."  The report further observed that if "a non-complying payment were discovered, OFAC would undoubtedly ask to see control procedures, and SCB's use in certain instances of the repair process may result in a heavier penalty than might otherwise be applied, and significant criticism."[20]

- In a 2005 e-mail from SCB's Group Legal Counsel to senior compliance staff in the U.K., counsel communicated OFAC's stated concern that "some banks may suppress information" on SWIFT payment messages and warned that bankers must take OFAC sanctions "seriously" or risk penalties ranging from civil enforcement actions to criminal prosecutions.[21]

- In a note to file describing a December 29, 2005 meeting attended by SCB's General Counsel, Head of Legal and Compliance, and outside UK counsel, those individuals considered whether the new CEO for the Americas – who was the former CEO for the United Arab Emirates – was obligated to report to U.S. regulators any suspicions he may have had regarding SCB's Iran business conducted in Dubai and "*whether his physical presence in the USA heightens the prospect [of him] becoming a more available witness of fact for SCB's Iran Business.*"  (Emphasis added).[22]

---

[20] The NY Order identifies the source of this evidence as a December 1, 2005 memorandum entitled *Project Gazelle* that was drafted by SCB's Group Head of Compliance and Regulatory Risk and its CEO, United Arab Emirates and provided to SCB's Group Executive Director for Risk and its Group Head of Global Markets.  SCB INT 0017483.

[21] The NY Order identifies the source of this evidence as a memorandum entitled, *OFAC Meeting – 18 September 2005*, that was drafted by SCB's Group Legal Counsel for SCB's Group Executive Director and senior SCB staff.  SCB INT 0002985 – 0002987.

[22] The NY Order identifies the source of this evidence as a memorandum that summarized a December 29, 2005 meeting among SCB's Head of Legal & Compliance, its General Counsel,

- In a 2006 memorandum, SCB's General Counsel advised SCB's Audit and Risk Committee that "certain US$ clearing transactions handled in London were processed with the name of the Iranian Bank excluded or removed from the 'remitter field'" despite the "requirement that due diligence in respect of 'U-turn' payments should be undertaken by our office in New York." SCB's chief legal counsel rationalized, much as he had in 1995, that "it is reasonable to undertake due diligence on behalf of New York outside the US" even though "we are potentially placing our SCB New York office and the Bank at risk if our due diligence procedures are not fully effective."[23]

98.    By 2003, New York regulators had discovered other significant BSA/AML violations at SCB-NY, including deficiencies in its monitoring of suspicious activity by SCB clients and inadequate customer due diligence policies and procedures.

99.    As a result of that misconduct, SCB consented to a formal enforcement action and executed a written agreement with the NYSDFS and the Federal Reserve Bank of New York ("FRBNY") that required SCB to adopt sound BSA/AML practices with respect to foreign bank correspondent accounts (the "Sanctions Agreement").

100.   The Sanctions Agreement also required SCB to hire an independent consultant to conduct a retrospective transaction review for the period of July 2002 through October 2004. The regulators intended the review to identify suspicious activity involving accounts or transactions that passed through SCB-NY.

101.   SCB believed that the Sanctions Agreement imposed significant operational reforms that created negative "implications for [SCB's] growth ambition and strategic freedom that [went] way beyond just the US." As a result, SCB resolved "to exit the Written Agreement

---

and its U.K. outside legal counsel.  SCB INT 0017508.

[23] The NY Order identifies the source of this evidence as a February 23, 2006 memorandum entitled *Iranian Business* that was drafted by SCB's General Counsel and provided to SCB's Audit and Risk Committee.  SCB INT 0017372.

in a timely fashion" because the bank believed that the sanctions imposed a significant obstacle to SCB's growth and evolving business strategies.

102.  SCB retained Deloitte & Touche ("D&T") to conduct the required independent review and to report its findings to the regulators.

103.  In August and September 2005, D&T unlawfully gave SCB confidential historical transaction review reports that it had prepared for two other major foreign banking clients that were under investigation for OFAC violations and money laundering activities.  Those reports contained detailed and highly confidential information concerning foreign banks involved in illegal U.S. dollar clearing activities.

104.  Having improperly gleaned insights into the regulators' concerns and strategies for investigating U-Turn-related misconduct, SCB asked D&T to delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal SCB's Iranian U-Turn practices.  In an email discussing D&T's draft, a D&T partner admitted that "we agreed" to SCB's request because "this is too much and too politically sensitive for both SCB and Deloitte" and "[t]hat is why I drafted the watered-down version."

105.  In September 2005, SCB's CEO of the Americas met with the New York Department of Banking's Deputy Superintendent for Foreign Banks to discuss, among other things, SCB's Iranian business.  Rather than disclose SCB's improper stripping practices to the New York regulators, SCB's CEO lied by assuring the Deputy Superintendent that the bank was compliant in all matters related to Iran.

106.  As a result of high-profile enforcement actions at several prominent foreign banks, New York regulators in 2006 began to focus on SCB Iranian U-Turns.

107. In September 2006, New York regulators requested from SCB statistics on Iranian U-Turns, including the number and dollar volume of such transactions for a 12-month period. In response, SCB searched its records for 2005 and 2006, and uncovered 2,626 transactions totaling over $16 billion.

108. SCB-NY's Head of Compliance provided the data to SCB's CEO for the Americas, who in turn, sent it to the SCB Group Executive Director in London. In his memorandum to the Executive Director, the CEO expressed concern that this data would be the "wildcard entrant" in the ongoing review of U-Turns by regulators and could lead to "catastrophic reputational damage to the [bank]." Based on direction from "the powers that be," SCB-NY's Head of Compliance provided only four days of U-Turn data to regulators.

109. By employing the deceptively "watered-down" D&T report and the fraudulent data, SCB again managed to conceal the Iranian Transactions from the NYSDFS and the FRBNY. As a result, the regulators freed SCB from the restraints imposed by the Sanctions Agreement in 2007.

110. While SCB successfully misled the regulators to believe that SCB had corrected serious flaws in its BSA/AML program, quite the opposite was true.

111. By forging business records over many years to circumvent OFAC restrictions, SCB undermined all aspects of its supposed BSA/AML program. Because SCB regularly concealed the names of the high-risk Iranian clients that it served, it could not accurately track and evaluate their risk levels. Nor could SCB effectively screen for suspicious activity and suspicious financial transactions although that monitoring is essential to any reasonable BSA/AML program.

112. SCB's fraudulent concealment of Iran's role in the Iranian Transactions also prevented regulators from detecting potential threats to the U.S financial system and other national security breaches.

113. SCB's pledge to implement adequate procedures for assessing customer risk and suspicious activity was a critical component of the Sanctions Agreement. As a result, the NYSDFS would have kept the restrictions imposed by the Sanctions Agreement in place had SCB not meticulously disguised its willful misconduct.

114. In early 2009, after being contacted by certain law enforcement authorities, SCB conducted an internal investigation into its OFAC procedures. In May 2010, more than a year after it had commenced its own investigation, and notwithstanding its obligation to notify the NYSDFS of these matters promptly, SCB finally informed the NYSDFS of certain improprieties uncovered by the bank's review.

115. At a meeting held in May 2010, SCB assured the NYSDFS that the bank would take immediate corrective action. Notwithstanding that promise, the NYSDFS identified continuing and significant BSA/AML failures at SCB during its 2011 examination of SCB-NY.

116. According to the NY Order, those BSA/AML failures included:

    a. SCB's OFAC compliance system lacked the ability to identify misspellings and variations of names that appeared on the OFAC sanctioned list;

    b. SCB could provide no documented evidence of investigations undertaken before the bank released funds involved in transactions with parties whose names appeared on the OFAC-sanctioned list; and

      c. SCB-NY outsourced its entire OFAC compliance process to Chennai, India and could provide no evidence of any oversight provided to the Chennai office or even of any communications between the Chennai and the New York offices.

117.     According to the New York Times, on August 14, 2012, SCB agreed to pay NYSDFS $340 million to settle the claims that are asserted in the NY Order that SCB laundered hundreds of billions of dollars in tainted money for Iran and lied to regulators.

**E.**    **SCB's Unlawful Conduct Prevented Plaintiffs' Diligent Enforcement of Their Judgment**

118.  The speed with which Plaintiffs have responded to any information in response to their March 10, 2008 subpoena to OFAC demonstrates the diligence with which they have sought to enforce their Judgment against Iran.

119.  As noted above, within two days of receiving information from OFAC in June 2008 that Iranian assets were present in New York, Plaintiffs had those assets restrained by the U.S. District Court for the Southern District of New York in order to enforce a portion of their Judgment.

120.  Despite Plaintiffs' due diligence, SCB's unlawful conduct in conspiring with Iran to conceal Iranian assets in the U.S. has thwarted the enforcement of Plaintiffs' Judgment.

121.  Through the wrongful conduct described herein, SCB successfully conspired with Iran and its agencies and instrumentalities to avoid the enforcement of Plaintiffs' Judgment by concealing the transfer of Iranian assets through SCB-NY. Had those assets been reported to OFAC as required, substantial Iranian assets would have been blocked and thereby made available to Plaintiffs for the enforcement of their Judgment.

122.  For example, had SCB complied with applicable U.S. regulations instead of unlawfully assisting Iran in its longstanding efforts to evade U.S. sanctions and the judgments against it for its terrorist acts, transfers involving substantial assets of Iranian entities such as Bank Saderat and Bank Melli would have been blocked in New York, subjecting them to the enforcement of Plaintiffs' Judgment under TRIA, the FSIA and other applicable law.

123.  SCB's unlawful efforts to conceal its complicity with Iran and its unlawful conduct in engaging in prohibited transactions involving Iranian assets prevented Plaintiffs from discovering that Iranian assets against which Plaintiffs could enforce their Judgment were present in New York despite Plaintiffs' due diligence in pursuing such claims and enforcing their Judgment.

## CAUSE OF ACTION

### (For Tortious Interference with Collection of a Money Judgment)

124.  Plaintiffs repeat and reallege each of the preceding paragraphs as if set forth in full herein.

125.  At all relevant times, SCB knew or should have known that: (a) Bank Markazi, Bank Sadarat, Bank Melli and other Iranian entities were agencies and instrumentalities or alter egos of Iran and that Iran was therefore the beneficial owner of billions of dollars in assets involved in the Iranian Transactions described above in which SCB participated from the date of Plaintiffs' Judgment in 2007 through 2010; (b) Iran was a judgment debtor that owed a multi-billion dollar money judgment to Plaintiffs; and (c) processing the payments involved in the Iranian Transactions for the benefit of Bank Markazi, Bank Sadarat, Bank Melli and other Iranian entities would require the services of U.S. financial institutions or their subsidiaries, including, but not limited to, SCB-NY.

29

126.  At all relevant times, SCB and SCB-NY were required by applicable U.S. law to block transactions involving Bank Sadarat, Bank Melli and various other agencies and instrumentalities of Iran and to report those block transactions to OFAC in a timely manner.

127.  In furtherance of SCB's unlawful conspiracy with Iran and its agencies and instrumentalities, SCB intentionally concealed the status of Bank Melli, Bank Sadarat, Bank Markazi and various other agencies and instrumentalities of Iran as the beneficial owners of billions of dollars that were handled and processed by SCB-NY.

128.  Because of SCB's unlawful conduct, billions of dollars in which Iran or its agencies and instrumentalities had an ownership interest were secretly processed through SCB-NY in "stripped" transactions without the required notice to OFAC and New York's banking regulators.

129.  SCB was prohibited by law from engaging in the "stripped" transfers that it passed through SCB-NY.  In addition, SCB was required by law to report to OFAC the participation of Bank Melli, Bank Saderat and other OFAC-designated Iranian entities in the Iranian Transactions.

130.  Once OFAC added Bank Melli and Bank Saderat to its list of banned entities, SCB was also required by law to report any transactions involving those entities to OFAC, to refuse to effect transfers involving those entities, and to block the assets involved in those transactions.

131.  Had SCB complied with applicable laws and regulations, Plaintiffs would have executed their Judgment against the Iranian assets that SCB unlawfully concealed from regulators and, thus, from Plaintiffs.

132.  SCB directly benefitted from its participation in its conspiracy with Iran and its agencies and instrumentalities by charging and collecting substantial fees and commissions from various Iranian entities in exchange for the transfer services that SCB provided.

133.  By engaging in the foregoing misconduct, SCB acted knowingly to tortiously interfere with Plaintiffs' collection of the Judgment and proximately caused damage to Plaintiffs by preventing them from enforcing their Judgment.

134.  By reason of the foregoing, Plaintiffs were damaged by SCB's wrongful conduct because assets of Iran and its agencies and instrumentalities were processed through New York without the required notice to OFAC.  As a result, OFAC did not disclose the existence of those assets to Plaintiffs, and Plaintiffs were unable to enforce their Judgment against those assets.

135.  Accordingly, Plaintiffs are entitled to: (a) compensatory damages in an amount to be determined at trial; (b) punitive damages in an amount to be determined at trial; (c) interest at the legal rate; and (d) the payment of Plaintiffs' attorneys' fees and expenses.

WHEREFORE, Plaintiffs respectfully demand that judgment be entered in their favor and against SCB as follows:

A.      damages in an amount to be determined at trial;

B.      punitive damages in an amount to be determined at trial;

C.      the payment of Plaintiffs' attorneys' fees and expenses;

D.      interest at the legal rate; and

E.      such other and further relief as the Court deems appropriate.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury with respect to all issues so triable.

Dated: New York, New York,
       August 15, 2012

SALON MARROW DYCKMAN NEWMAN
& BROUDY LLP

By: _____
Liviu Vogel
292 Madison Avenue, 6th Floor
New York, NY  10017
Tel:  (212) 661-7100

-and-

STONE BONNER & ROCCO LLP
James P. Bonner
Patrick L. Rocco
260 Madison Avenue, 17th Floor
New York, NY  10016
Tel: (212) 239-4340

*Attorneys for Plaintiffs*

**Exhibit A**

Abbott, Terry
Allman, John Robert
Bates, Ronny Kent
Baynard, James
Beamon, Jess W.
Belmer, Alvin Burton
Blankenship, Richard D.
Blocker, John W.
Boccia, Joseph John Jr.
Bohannon, Leon
Bonk, John Jr.
Boulos, Jeffrey Joseph
Boyett, John Norman
Burley, William
Callahan, Paul
Camara, Mecot
Campus, Bradley
Ceasar, Johnnie
Conley, Robert Allen
Cook, Charles Dennis
Copeland, Johnny Len
Cosner, David
Coulman, Kevin
Crudale, Rick
Cyzick, Russell
Devlin, Michael
Dorsey, Nathaniel
Dunnigan, Timothy
Earle, Bryan
Estes, Danny R.
Fluegel, Richard Andrew
Fulcher, Michael D.
Gallagher, Sean
Gangur, George
Garcia, Randall
Ghumm, Harold
Giblin, Timothy
Gorchinski, Michael
Gordon, Richard
Green, Davin M.
Hairston, Thomas
Haskell, Michael
Helms, Mark Anthony
Hester, Stanley G.
Hildreth, Donald Wayne
Holberton, Richard
Hudson, Dr. John
Hukill, Maurice Edward
Iacovino, Edward Jr.
Innocenzi, Paul III

Jackowski, James
James, Jeffrey Wilbur
Jenkins, Nathaniel Walter
Johnston, Edward Anthony
Jones, Steven
Julian, Thomas Adrian
Keown, Thomas
Kluck, Daniel
Knipple, James C.
Kreischer, Freas H. III
Laise, Keith
Langon, James IV
LaRiviere, Michael Scott
LaRiviere, Steven
Lemnah, Richard
Livingston, Joseph R. ("Joel") III
Lyon, Paul D. Jr.
Macroglou, John
Maitland, Samuel Jr.
Martin, Charlie Robert
Massa, David
McCall, John
McDonough, James E.
McMahon, Timothy R.
Menkins, Richard II
Meurer, Ronald
Milano, Joseph Peter
Moore, Joseph
Myers, Harry Douglas
Nairn, David
Olson, John Arne
Owens, Joseph Albert
Page, Connie Ray
Parker, Ulysses Gregory
Pearson, John L.
Perron, Thomas S.
Phillips, John Arthur Jr.
Pollard, William Roy
Prevatt, Victor Mark
Price, James
Prindeville, Patrick Kerry
Quirante, Diomedes J.
Richardson, Warren
Rotondo, Louis J.
Sauls, Michael Caleb
Schnorf, Charles Jeffrey
Schultz, Scott Lee
Scialabba, Peter
Scott, Gary Randall
Shipp, Thomas Alan

Shropshire, Jerryl
Simpson, Larry H. Jr.
Smith, Kirk Hall
Smith, Thomas Gerard
Smith, Vincent
Sommerhof, William Scott
Spencer, Stephen Eugene
Stelpflug, William
Stephens, Horace Renardo Jr.
("Ricky")
Stockton, Craig
Stokes, Jeffrey
Sturghill, Eric D.
Sundar, Devon
Thorstad, Thomas Paul
Tingley, Stephen
Vallone, Donald H. Jr.
Washington, Eric Glenn
Wigglesworth, Dwayne
Williams, Rodney J.
Williams, Scipio Jr.
Williamson, Johnny Adam
Winter, William Ellis
Woollett, Donald Elberan
Wyche, Craig
Young, Jeffrey D.
Albright, Marvin
Arroyo, Pablo
Banks, Anthony
Burnette, Rodney Darrell
Comes, Frank Jr.
Dolphin, Glenn
Eaves, Frederick Daniel
Frye, Charles
Garner, Truman Dale
Gerlach, Larry
Hlywiak, John
Hunt, Orval
Jacobs, Joseph P.
Kirkpatrick, Brian
Matthews, Burnham
Mitchell, Timothy
Moore, Lovelle "Darrell"
Nashton, Jeffrey
Oliver, John
Rivers, Paul
Russell, Stephen
Spaulding, Dana
Swinson, Craig Joseph
Toma, Michael

196975

Wheeler, Danny
Young, Thomas D.
Abbey, Lilla Woollett
Abbott, James
Abbott, Mary (Estate of)
Adams, Elizabeth
Ahlquist, Eileen Prindeville
Alarcon, Miralda (Judith Maitland)
Allman, Anne
Allman, Robert
Allman, Theodore (Estate of)
Allman, DiAnne Margaret
("Maggie")
Alvarez, Margaret E.
Angus, Kimberly F.
Bates, Donnie
Bates, Johnny
Bates, Laura
Bates, Margie
Bates, Monty
Bates, Thomas Jr.
Bates, Thomas C., Sr.
Baumgartner, Mary E.
Baynard, Anthony
Baynard, Barry
Baynard, Emerson
Baynard, Philip
Baynard, Thomasine
Baynard, Timothy
Baynard, Wayne
Baynard, Stephen
Beard, Anna
Beck, Mary Ann
Belmer, Alue
Belmer, Annette
Belmer, Clarence
Belmer, Colby Keith
Belmer, Denise
Belmer Donna
Belmer, Faye
Belmer, Kenneth
Belmer, Luddie
Biellow, Shawn
Black, Mary Frances
Blankenship, Donald Jr.
Blankenship, Donald Sr.
Blankenship, Mary (Estate of)
Blocker, Alice
Blocker, Douglas
Blocker, John R.
Blocker, Robert

Boccia, James
Boccia, Joseph Sr.
Boccia, Patricia
Boccia, Raymond
Boccia, Richard
Boccia, Ronnie (Veronica)
Boddie, Leticia
Bohannon, Angela
Bohannon, Anthony
Bohannon, Carrie
Bohannon, David
Bohannon, Edna
Bohannon, Leon Sr.
Bohannon, Ricki
Bolinger, Billie Jean
Boulos, Joseph
Boulos, Lydia
Boulos, Marie
Bowler, Rebecca
Boyett, Lavon
Boyett, Norman E. Jr. (Estate of)
Boyett, Theresa U. Roth
Boyett, William A.
Breeden, Susan Schnorf
Briscoe, Damion
Brown, Christine
Brunette, Rosanne
Buckner, Mary Lynn
Burley, Claude (Estate of)
Burley, William Douglas (Estate
of)
Burley, Myra
Calabro, Kathleen
Caldera, Rachel
Callahan, Avenell
Callahan, Michael
Calloway, Patricia (Patsy Ann)
Camara, Elisa Rock
Camara, Theresa Riggs
Campbell, Candace
Campus, Clare
Capobianco, Elaine
Carter, Florene Martin
Cash, Phyllis A.
Catano, Theresa
Ceasar, Bruce
Ceasar, Franklin
Ceasar, Fredrick
Ceasar, Robbie Nell
Ceasar, Sybil
Cecca, Christine Devlin

Chapman, Tammy
Cherry, James
Cherry, Sonia
Chios, Adele H.
Christian, Jana M.
Christian, Sharon Rose
Ciupaska, Susan
Clark, LeShune Stokes
Clark, Rosemary
Cobble, Mary Ann
Collard, Karen Shipp
Collier, Jennifer
Collier, Melia Winter
Coltrane, Deborah M.
Conley, James N. Jr.
Conley, Roberta Li
Cook, Charles F.
Cook, Elizabeth A.
Cook, Mary A. (Estate of)
Copeland, Alan Tracy
Copeland, Betty
Copeland, Donald
Corry, Blanche
Cosner, Harold
Cosner, Jeffrey
Cosner, Leanna
Cosner, Marva Lynn (Estate of)
Cossaboom, Cheryl
Coulman, Bryan Thomas
Coulman, Christopher J.
Coulman, Dennis P.
Coulman, Lorraine M.
Coulman, Robert D.
Coulman, Robert Louis
Covington, Charlita Martin
Crouch, Amanda
Crudale, Marie
Cyzick, Eugene
Dallachie, Lynn
Deal, Anne
Derbyshire, Lynn Smith
Desjardins, Theresa
Devlin, Christine
Devlin, Daniel
Devlin, Gabrielle
Devlin, Richard
Devlin, Sean
Donahue (Milano), Rosalie
Doray, Ashley
Doss, Rebecca
Dunnigan, Chester

Dunnigan, Elizabeth Ann
Dunnigan, Michael
Dunnigan, William
Dunnigan, Claudine
Edquist, Janice Thorstad
Ervin, Mary Ruth
Estes, Barbara
Estes, Charles
Estes, Frank
Fansler, Lori
Farthing, Angela Dawn
Ferguson, Arlington
Ferguson, Hilton
Fish, Linda Sandback
Fox, Nancy Brocksbank
Fox, Tia
Freshour, Tammy
Fulcher, Ruby
Gallagher, Barbara
Gallagher, Brian
Gallagher, James (Estate of)
Gallagher, James Jr.
Gallagher, Kevin
Gallagher, Michael
Gangur, Dimitri
Gangur, Mary
Garcia, Jess
Garcia, Ronald
Garcia, Roxanne
Garcia, Russell
Garcia, Violet
Garza, Suzanne Perron
Gattegno, Jeanne
Ghumm, Arlene
Ghumm, Ashley
Ghumm, Bill
Ghumm, Edward
Ghumm, Hildegard
Ghumm, Jedaiah (Estate of)
Ghumm, Jesse
Ghumm, Leroy
Ghumm, Moronica
Giblin, Donald
Giblin, Jeanne
Giblin, Michael
Giblin, Tiffany
Giblin, Valerie
Giblin, William
Gilford-Smith, Thad
Gintonio, Rebecca
Goff, Dawn

Gorchinski, Christina
Gorchinski, Judy
Gorchinski, Kevin
Gorchinski, Valerie
Gordon, Alice
Gordon, Joseph
Gordon, Linda
Gordon, Norris (Estate of)
Gordon, Paul
Grant, Andrea
Graves, Deborah
Green, Deborah
Gregg, Liberty Quirante
Griffin, Alex
Grimsley, Catherine E.
Gummer, Megan
Guz, Lyda Woollett
Hairston, Darlene
Hanrahan, Tara
Hart, Mary Clyde
Haskill, Brenda
Haskell, Jeffrey
Hedge, Kathleen S.
Helms, Christopher Todd
Helms, Marvin R.
Hester, Doris
Hildreth, Clifton
Hildreth, Julia
Hildreth, Mary Ann
Hildreth, Michael Wayne
Hilton, Sharon A.
Holberton, Donald
Holberton, Patricia Lee
Holberton, Thomas
Hollifield, Tangie
Horner, Debra
House, Elizabeth
Houston, Joyce A.
Howell, Tammy Camara
Hudson, Lisa H.
Hudson, Lorenzo
Hudson, Lucy
Hudson, Ruth
Hudson, Samuel (Estate of)
Hudson, William J.
Hugis, Susan Thorstad (Estate of)
Hurlburt, Nancy Tingley
Hurston, Cynthia Perron
Iacovino, Edward Sr. (Estate of)
Iacovino, Elizabeth
Innocenzi, Deborah

Innocenzi, Kristin
Innocenzi, Mark Innocenzi, Paul IV
Jaccom, Bernadette
Jackowski, John Jr.
Jackowski, John Sr.
Jacobus, Victoria
James, Elaine
Jenkins, Nathalie C.
Jenkins, Stephen
Jewett, Rebecca
Johnson, Linda Martin
Johnson, Ray
Johnson, Rennitta Stokes
Johnson, Sherry
Johnston, Charles
Johnston, Edwin
Johnston, Mary Ann
Johnston, Zandra LaRiviere
Jones, Alicia
Jones, Corene Martin
Jones, Kia Briscoe
Jones, Mark
Jones, Ollie
Jones, Sandra D.
Jones, Synovure (Estate of)
Jordan, Robin Copeland
Jordan, Susan Scott
Julian, Joyce
Julian, Karl
Jurist, Nada
Keown, Adam
Keown, Bobby Jr.
Keown, Bobby Sr.
Keown, Darren
Keown, William
Kirker, Mary Joe
Kluck, Kelly
Kluck, Michael
Knipple, John D. (Estate of)
Knipple, John R.
Knipple, Pauline (Estate of)
Knox, Shirley L.
Kreischer, Doreen
Kreischer, Freas H. Jr.
Lake, Cynthia D.
Lange, Wendy L.
Langon, James III
LaRiviere, Eugene
LaRiviere, Janet
LaRiviere, John M.

LaRiviere, Lesley
LaRiviere, Michael
LaRiviere, Nancy
LaRiviere, Richard
LaRiviere, Richard G. (Estate of)
LaRiviere, Robert
LaRiviere, William
Lawton, Cathy L.
LeGault, Heidi Crudale
Lemnah, Clarence (Estate of)
Lemnah, Etta
Lemnah, Fay
Lemnah, Harold
Lemnah, Marlys
Lemnah, Robert
Lemnah, Ronald
Livingston, Annette R.
Livingston, Joseph R. IV
Livingston, Joseph R. Jr. (Estate of)
Lynch, Robin M.
Lyon, Earl
Lyon, Francisco
Lyon, June
Lyon, Maria
Lyon, Paul D. Sr.
Lyon, Valerie
Macroglou, Heather
Mahoney, Kathleen Devlin
Maitland, Kenty
Maitland, Leysnal
Maitland, Samuel Sr.
Maitland, Shirla
Marshall, Virginia Boccia
Martin, John
Martin, Pacita
Martin, Renerio
Martin, Ruby
Martin, Shirley
Mason, Mary
Massa, Cristina
Massa, Edmund
Massa, Joao ("John")
Massa, Jose ("Joe")
Massa, Manuel Jr.
Massa, Ramiro
McCall, Mary
McCall, Thomas (Estate of)
McCall, Valerie
McDermott, Gail
McFarlin, Julia A.

McMahon, George
McMahon, Michael
McPhee, Patty
Menkins, Darren
Menkins, Gregory
Menkins, Margaret
Menkins, Richard H.
Meurer, Jay T.
Meurer, John
Meurer, John Thomas
Meurer, Mary Lou
Meurer, Michael
Meyer, Penny
Milano, Angela
Milano, Peter Jr.
Miller, Earline
Miller, Henry
Miller, Patricia
Montgomery, Helen
Moore, Betty
Moore, Harry
Moore, Kimberly
Moore, Mary
Moore, Melissa Lea
Moore, Michael (Estate of)
Moy, Elizabeth Phillips.
Myers, Debra
Myers, Geneva
Myers, Harry A.
Nairn, Billie Ann
Nairn, Campbell J. III
Nairn, Campbell J. Jr. (Estate of)
Nairn, William P.
Norfleet, Richard
O'Connor, Deborah
Olaniji, Pearl
Olson, Bertha (Estate of)
Olson, Karen L.
Olson, Randal D.
Olson, Roger S.
Olson, Ronald J.
Olson, Sigurd (Estate of)
Owens, David
Owens, Deanna
Owens, Frances
Owens, James (Estate of)
Owens, Steven
Page, Connie Mack
Page, Judith K.
Palmer, Lisa Menkins
Paolozzi, Geraldine

Pare, Maureen
Parker, Henry James
Parker, Sharon
Pearson, Helen M.
Pearson, John L. Jr.
Pearson, Sonia
Perron, Brett
Perron, Deborah Jean
Perron, Michelle
Perron, Ronald R.
Persky, Muriel
Peterson, Deborah D.
Petry, Sharon Conley
Petrick, Sandra
Phelps, Donna Vallone
Phillips, Harold
Phillips, John Arthur Sr.
Plickys, Donna Tingley
Pollard, Margaret Aileen
Pollard, Stacey Yvonne
Prevatt, Lee Hollan
Prevatt, Victor Thornton
Price, John
Price, Joseph
Prindeville, Barbara D. (Estate of)
Prindeville, Kathleen Tara
Prindeville, Michael
Prindeville, Paul
Prindeville, Sean
Quirante, Belinda J.
Quirante, Edgar
Quirante, Godofredo (Estate of)
Quirante, Milton
Quirante, Sabrina
Ray, Susan
Reininger, Laura M.
Richardson, Alan
Richardson, Beatrice
Richardson, Clarence
Richardson, Eric
Richardson, Lynette
Richardson, Vanessa
Richardson-Mills, Philiece
Ricks, Melrose
Riva, Belinda Quirante
Rockwell, Barbara
Rooney, Linda Rose,
Tara Smith
Ruark, Tammi
Rudkowski, Juliana
Russell, Marie McMahon

Sanchez, Alicia Lynn
Sauls, Andrew
Sauls, Henry Caleb
Sauls, Riley A.
Schnorf, Margaret Medler
Schnorf, Richard (brother)
Schnorf, Richard (father)
Schnorf, Robert
Schultz, Beverly
Schultz, Dennis James
Schultz, Dennis Ray
Scialabba, Frank
Scialabba, Jacqueline
Scialabba, Samuel Scott
Scott, Jon Christopher
Scott, Kevin James
Scott, Larry L. (Estate of)
Scott, Mary Ann
Scott, Sheria
Scott, Stephen Allen
Seguerra, Jacklyn
Shipp, Bryan Richard
Shipp, James David
Shipp, Janice
Shipp, Maurice
Shipp, Pauline
Shipp, Raymond Dennis
Shipp, Russell
Sinsioco, Susan J.
Smith-Ward, Ana
Smith, Angela Josephine (Estate of)
Smith, Bobbie Ann
Smith, Cynthia
Smith, Donna Marie
Smith, Erma
Smith, Holly
Smith, Ian
Smith, Janet
Smith, Joseph K. III
Smith, Joseph K. Jr.
Smith, Keith
Smith, Kelly B.
Smith, Shirley L.
Smith, Tadgh
Smith, Terrence
Smith, Timothy B.
Sommerhof, Jocelyn J.
Sommerhof, John
Sommerhof, William J.
Spencer, Douglas

Stelpflug, Christy Williford
Stelpflug, Joseph
Stelpflug, Kathy Nathan
Stelpflug, Laura Barfield
Stelpflug, Peggy
Stelpflug, William
Stephens, Horace Sr.
Stephens, Joyce
Stephens, Keith
Stockton, Dona
Stockton, Donald (Estate of)
Stockton, Richard
Stokes, Irene
Stokes, Nelson Jr.
Stokes, Nelson Sr. (Estate of)
Stokes, Robert
Stokes-Graham, Gwenn
Sturghill, Marcus D.
Sturghill, Marcus L. Jr.
Sturghill, NaKeisha Lynn
Sundar, Doreen
Tella, Margaret
Terlson, Susan L.
Thompson, Mary Ellen
Thorstad, Adam
Thorstad, Barbara
Thorstad, James Jr.
Thorstad, James Sr.
Thorstad, John
Thorstad, Ryan
Thurman, Betty Ann
Tingley, Barbara
Tingley, Richard L.
Tingley, Russell
Tolliver, Keysha
Turek, Mary Ann
Valenti, Karen
Vallone, Anthony
Vallone, Donald H.
Vallone, Timothy
Vargas, Leona Mae
Voyles, Denise
Wallace, Ila
Wallace, Kathryn Thorstad
Wallace, Richard J.
Warwick, Barbara Thorstad
Washington, Linda
Washington, Vancine
Watson, Kenneth
Whitener, Diane
Wigglesworth, Daryl

Wigglesworth, Darrin A.
Wigglesworth, Henry
Wigglesworth, Mark
Wigglesworth, Robyn
Wigglesworth, Sandra
Wigglesworth, Shawn
Williams, Dianne Stokes
Williams, Gussie Martin
Williams, Janet
Williams, Johnny
Williams, Rhonda
Williams, Ronald
Williams, Ruth
Williams, Scipio J.
Williams, Wesley
Williams-Edwards, Delma
Williamson, Tony
Williamson, Jewelene
Winter, Michael
Wiseman, Barbara
Woodford, Phyllis
Woodle, Joyce
Woollett, Beverly
Woollett, Paul
Wright, Melvina Stokes
Wright, Patricia
Wyche, Glenn
Wyche, John
Young, John F.
Young, John W.
Young, Judith Carol
Young, Sandra Rhodes
Zimmerman, Joanne
Zone, Stephen Thomas
Zosso, Patricia Thorstad
Ali, Jamaal Muata
Angeloni, Margaret
Arroyo, Jesus
Arroyo, Milagros
Carletta, Olympia
Carpenter, Kimberly
Comes, Joan
Comes, Patrick
Comes, Christopher
Comes, Frank Sr.
Crawford, Deborah
Davis, Barbara
Franklin, Alice Warren
Gerlach, Patricia
Gerlach, Travis
Gerlach, Megan

Hernandez, Arminda
Hlywiak, Margaret
Hlywiak, Peter Jr.
Hlywiak, Peter Sr.
Hlywiak, Paul
Hlywiak, Joseph
Hunt, Cynthia Lou
Ibarro, Rosa
Jacobs, Andrew Scott
Jacobs, Daniel Joseph
Jacobs, Danita
Kirkpatrick, Kathleen
Lewis, Grace
Magnotti, Lisa
Mitchell, Wendy
Moore, James Otis (Estate of)
Moore, Johnney S. (Estate of)
Moore, Marvin S.
Moore, Alie Mae
Moore-Jones, Jonnie Mae
Nashton, Alex W. (Estate of)
Oliver, Paul
Oliver, Riley
Oliver, Michael John
Oliver, Ashley E.
Oliver, Patrick S.
Oliver, Kayley
Russell, Tanya
Russell, Wanda
Russell, Jason
Shaver, Clydia
Spaulding, Scott
Stanley, Cecilia
Stilpen, Mary
Swank, Kelly
Swinson, Kenneth J. (Estate of)
Swinson, Ingrid M. (Estate of)
Swinson, Daniel
Swinson, William
Swinson, Dawn
Swinson, Teresa
Warren, Bronzell
Watson, Jessica
Webb, Audrey
Wheeler, Jonathan
Wheeler, Benjamin
Wheeler, Marlis "Molly" (Estate of)
Wheeler, Kerry
Wheeler, Andrew
Wheeler, Brenda June

Wold, Jill
Young, Nora (Estate of)
Young, James
Young, Robert (Estate of)